UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Karissa M. Garner,

                                   Plaintiff,                    **REPORT AND**
                                                                **RECOMMENDATION**
          *- against -*
                                                                **13 CV 5786 (CS)(LMS)**
Nancy A. Berryhill,[1]
*Acting Commissioner of Social Security,*

                                   Defendant.
_____

TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.

        Plaintiff Karissa Garner brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner"), which denied her applications for Social Security Disability ("SSD") benefits

and Supplemental Security Income ("SSI") benefits.  ECF No. 1.  Currently pending before the

Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  ECF Nos. 11, 22.  For the reasons discussed below, I

conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's motion

should be denied and the Commissioner's motion should be granted.

I.    **BACKGROUND**

      A.    **Procedural History**

      Plaintiff filed concurrent applications for Social Security Disability benefits ("SSD")[2] and

_____

[1] Nancy A. Berryhill was designated Acting Commissioner of Social Security, effective January
23, 2017, and is automatically substituted herein as Defendant pursuant to Fed. R. Civ. P. 25(d).
[2] SSD requires that the applicant be both disabled and insured for benefits.  42 U.S.C. §
423(a)(1)(A), (C); 20 C.F.R. § 404.101, 404.120, 404.315(a).  Plaintiff's date last insured is Dec.
31, 2009.  ECF No. 12, at 1.

1

Supplemental Security Income ("SSI") benefits on June 21, 2011, and July 19, 2011, respectively. Administrative Record ("AR") 95-96. Plaintiff alleged disability through mental illness beginning August 1, 2007. AR 95-96. On October 31, 2011, the Social Security Administration ("SSA") District Office 117, in New York, New York, denied Plaintiff's applications. AR 97-102. On November 18, 2011, Plaintiff filed a request to have a hearing before an Administrative Law Judge ("ALJ") (AR 103), which was held before ALJ Mark Solomon on May 4, 2012. AR 73-94. In a decision dated May 29, 2012, the ALJ determined that Plaintiff was not disabled. AR 57-72. Plaintiff subsequently filed a request for review of the ALJ's decision with the Appeals Council (AR 56), which was denied on June 18, 2013. AR 6-12. Accordingly, the ALJ's decision became the final action of the Commissioner.

The instant action, filed on August 16, 2013, followed. ECF No. 1. Plaintiff argues that the Commissioner's findings are unsupported by substantial evidence and contrary to law and regulations promulgated under the Social Security Act (the "Act"). ECF No. 1, at 3. She asks that this Court modify the decision of the Commissioner to grant the SSD benefits and SSI payments and for such other relief as this Court may deem just and proper. ECF No. 1, at 3-4. Alternatively, Plaintiff requests that this Court remand the claim for a new hearing and decision consistent with the laws and regulations. ECF No. 12, at 19.

**B.** **Medical Evidence**

**1.** **Records Prior to Plaintiff's SSI and SSD Applications**

Plaintiff began mental health treatment at the Emma L. Bowen Community Center on July 11, 2008, for anxiety, panic attacks with agoraphobia,[3] and depression. AR 250-68. On

---

[3] Agoraphobia is a type of anxiety disorder which causes one to fear and often avoid places or situations that might cause panic and make one feel trapped, helpless, or embarrassed. Diseases and Conditions: Agoraphobia, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/agoraphobia/basics/definition/con-20029996 (last visited March 16, 2017).

July 30, 2008, Plaintiff was evaluated by Dr. Hilda Brewer, a psychiatrist. AR 265-70. Dr.

Brewer diagnosed Plaintiff with mood disorder and panic disorder with agoraphobia and

prescribed Abilify and Zoloft.[4] AR 269. Her global assessment of functioning ("GAF") score

was 50.[5] AR 269.

Plaintiff began attending weekly individual counseling sessions with various social

workers and monthly medication management with Dr. Deepika Singh, a psychiatrist. AR 250-

468. From August 8, 2008, until August 2, 2011, Dr. Singh frequently modified Plaintiff's

prescriptions. AR 484-87. On September 5, 2008, Dr. Singh discontinued Zoloft and prescribed

Lexapro and Klonopin;[6] on June 15, 2009, Dr. Singh discontinued Lexapro and prescribed

---

[4] Abilify is the brand name for the drug Aripiprazole, which is an antipsychotic agent used to treat major depressive disorder. Drugs and Supplements: Aripiprazole (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/description/drg-20066890 (last visited Jan. 27, 2017); Zoloft is the brand name for the drug Sertraline, which is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression, panic disorder, and social anxiety disorder. Drugs and Supplements: Sertraline (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited Jan. 27, 2017).

[5] A GAF tests an individual's overall level of functioning on a continuum of mental health illness, on a 1-100 scale. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 2000). A score of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job)." Id. at 32.

[6] Lexapro is the brand name for the drug Escitalopram, which is an SSRI, used to treat depression and generalized anxiety disorder. Drugs and Supplements: Escitalopram (Oral Route), Mayo Clinic, http://www.mayoclinic.org/_drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Jan. 27, 2017); Klonopin is the brand name for the drug Clonazepam, which is a central nervous system depressant used to treat panic disorder as well as certain seizure disorders. Drugs and Supplements: Clonazepam (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited Jan. 27, 2017).

Prozac[7] (AR 408); and on July 8, 2009, Dr. Singh discontinued Prozac and prescribed Paxil.[8] AR 485-86.

Dr. Naghma Burney was Plaintiff's treating physician from July 2008 through August 2011. AR 216-48. On July 23, 2008, Dr. Burney assessed Plaintiff as having depression with anxiety. AR 216. On August 14, 2008, Dr. Burney further assessed that Plaintiff suffered from anxiety disorder and mood disorder. AR 217. Dr. Burney's treatment of Plaintiff continued after her applications for SSI and SSD benefits. AR 216-48.

## 2.    Records Subsequent to Plaintiff's SSI and SSD Applications

On June 29, 2011, Dr. Burney ordered a magnetic resonance imaging ("MRI") in response to Plaintiff's headache complaints. AR 231-32. The results of the MRI were unremarkable. AR 249. On July 20, 2011, Plaintiff complained of migraines, for which Dr. Burney prescribed Imitrex.[9] AR 233. On August 10, 2011, Plaintiff reported that the Imitrex had been working to resolve her issues with migraines. AR 235.

On September 19, 2011, Plaintiff received an evaluation from Dr. Fujiwaki, a SSA consultative psychologist, at the request of the SSA. AR 493. Dr. Fujiwaki diagnosed Plaintiff with depressive disorder, anxiety disorder and migraines. AR 496. Plaintiff indicated to Dr. Fujiwaki that her most recent panic attack was July 11, 2011. AR 494. Dr. Fujiwaki determined

---

[7] Prozac is the brand name for the drug Fluoxetine, which is an SSRI, used to treat depression and panic disorder. Drugs and Supplements: Fluoxetine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/ fluoxetine-oral-route/description/drg-20063952 (last visited Jan. 27, 2017).

[8] Paxil is the brand name for the drug Paroxetine, which is an SSRI, used to treat depression, panic disorder, generalized anxiety disorder, and social anxiety disorder. Drugs and Supplements: Clonazepam (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/paroxetine-oral-route/description/drg-20067632 (last visited Jan. 27, 2017).

[9] Imitrex is the brand name for the drug Sunatriptan, which belongs to the group of medicines called triptans, and is used to treat acute migraine headaches. Drugs and Supplements: Sumatriptan (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/description/drg-20074356 (last visited Jan. 27, 2017).

that Plaintiff could follow and understand simple instructions; perform simple and complex tasks independently; maintain attention and concentration; maintain a regular schedule with assistance; learn new tasks; and make appropriate decisions. AR 495. Additionally, Dr. Fujiwaki's assessment stated that Plaintiff may have some difficulty relating with others and dealing with stress. AR 495. Dr. Fujiwaki also noted that Plaintiff traveled to the appointment accompanied by a friend. AR 493.

On September 19, 2011, Plaintiff was examined by Dr. Aurelio Salon for a consultative medical examination. AR 489-92. Dr. Salon noted that Plaintiff came to the facility accompanied by a friend, and arrived by public transportation. AR 491. Dr. Salon determined that Plaintiff had no limitations in sitting, standing, carrying heavy objects, climbing, pulling, and/or pushing. AR 492. Plaintiff informed Dr. Salon that she showered, bathed, dressed herself, cooked, cleaned, washed laundry, shopped, and took care of her child. AR 490. Dr. Salon's diagnosis included a history of anxiety and depression with panic disorder and agoraphobia, a history of migraine headaches, and obesity. AR 491-92.

On October 11, 2011, Plaintiff was assessed by state agency psychological consultant Dr. T. Harding. AR 497-500. Dr. Harding opined that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to travel in unfamiliar places or use public transportation; and her ability to set realistic goals or make plans independently of others. AR 498. Dr. Harding also determined that Plaintiff had no significant limitations in remembering locations and work-like procedures; understanding, remembering, and carrying out short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; sustaining an ordinary routine; making simple work-related decisions; completing a normal workday and work

week without interruptions from psychologically-based symptoms; interacting appropriately with the general public; asking simple questions and requesting assistance; getting along with co-workers and peers; maintaining socially acceptable behavior; and responding appropriately to changes in the work setting. AR 297-98. Dr. Harding concluded that Plaintiff's psychiatric impairments were not severe enough to interfere with her ability to perform unskilled work and/or activities of daily living. AR 499.

On March 28, 2012, Kathy Klein, a licensed clinical social worker ("LCSW"), completed a Psychiatric/Psychological Impairment Questionnaire which was signed by Dr. Singh. AR 558-65. Both Ms. Klein and Dr. Singh were employees of Upper Manhattan Mental Health Center and the questionnaire was completed shortly after Ms. Klein was assigned to Plaintiff. AR 555, 565. Plaintiff was diagnosed with generalized anxiety disorder, with a GAF score of 60.[10] AR 558. Ms. Klein noted symptoms of sleep disturbance, social withdrawal, mood disturbance, decreased energy, and persistent anxiety. AR 558. It was also noted that Plaintiff's symptoms prevented her from traveling alone and leaving her home. AR 558. Moreover, Ms. Klein indicated that Plaintiff was markedly limited in her abilities to perform activities within a schedule; maintain regular attendance; be punctual within customary tolerance; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and travel to unfamiliar places or use public transportation. AR 561-63. Ms. Klein also stated that Plaintiff was moderately limited in her abilities to sustain an ordinary routine without supervision and set realistic goals,

---

[10] A GAF score of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).

or make plans, independently. AR 561-62. Ms. Klein further determined that Plaintiff had no significant limitations in remembering locations and work-like procedures; understanding, remembering, and carrying out one or two-step instructions; maintaining attention and concentration for extended periods; interacting appropriately with the general public; asking simple questions or requesting assistance; and maintaining socially appropriate behavior. AR 561-62.

### 3. Evidence Received Subsequent to the ALJ's Decision

On August 29, 2012, Dr. Eshkenazi conducted a psychiatric evaluation of Plaintiff, including a review of her treatment records. AR 37-39. Plaintiff's father accompanied her to the appointment. AR 38. At the time of the evaluation, Plaintiff was taking Prozac for depression and Klonopin for anxiety. AR 38. Dr. Eshkenazi diagnosed Plaintiff with generalized anxiety with panic attacks and concluded that Plaintiff required further psychiatric treatment and medication. AR 39. Dr. Eshkenazi opined that Plaintiff was not limited in her ability to remember locations and work-like procedures; carry out simple two-step instructions; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and remain aware of normal hazards and take appropriate precautions. AR 43-45.

Dr. Eshkenazi stated that plaintiff was mildly limited in her abilities to understand and remember one or two step instructions; carry out detailed instructions; interact appropriately with the general public; and ask simple questions or request assistance. AR 43-45. Dr. Eshkenazi further stated that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or in proximity to others without being distracted by

7

them; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently. AR 43-45. Finally, Dr. Eshkenazi stated that Plaintiff was markedly limited in her ability to use public transportation; complete a normal workweek without interruptions from her psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. AR 44-45. Dr. Eshkenazi assigned Plaintiff a GAF of 60-65.[11] AR 40.

On September 21, 2012, Plaintiff met with Dr. Michael Naarendorp. AR 23. The records indicate that Plaintiff was no longer taking Paxil, but had been re-prescribed Prozac, and continued taking Klonopin. AR 23. Plaintiff complained of dry mouth, joint pain, and fatigue for which she was prescribed Prednisone.[12] AR 23. At a follow up appointment on October 19, 2012, Plaintiff informed Dr. Naarendorp that the medication had helped to reduce joint pain and migraine headaches. AR 25. Plaintiff continued to complain of dry mouth and fatigue, for which she was prescribed Salagen and Hydroxychloroquine.[13] AR 25. Plaintiff continued to see

_____

[11] A GAF score of 61-70 denotes "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).

[12] Prednisone is a corticosteroid, which is a drug used to relieve inflammation, such as swelling and arthritis. Drugs and Supplements: Prednisone (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/description/drg-20075269 (last visited Feb. 17, 2017).

[13] Salagen is the brand name for Pilocarpine, which is a drug used to treat dry mouth. Drugs and Supplements: Pilocarpine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/pilocarpine-oral-route/description/drg-20065496 (last visited Feb. 17, 2017); Hydroxychloroquine belongs to the family of medicines called antiprotozoals, and is used in the treatment of arthritis to help relieve inflammation, swelling, stiffness, and joint pain. Drugs and Supplements: Hydroxychloroquine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/hydroxychloroquine-oral-route/description/drg-20064216 (last visited Feb. 17, 2017).

8

Dr. Naarendorp through November 30, 2012. AR 32. Throughout this time, Plaintiff continued to complain of fatigue, but was not given any significant changes in medication or diagnosis. AR 26-33.

### C. Other Evidence

#### 1. Plaintiff's Disability Application

Plaintiff completed a questionnaire as a part of her disability application on August 30, 2011. AR 181. In the application, Plaintiff indicated that she cared for her son, prepared meals daily, cleaned her home, fed and took care of her cat, socialized with visiting friends, read, and watched television. AR 173-76. She expressed difficulty in doing laundry, leaving her home, and using public transportation. AR 175. She also experienced frequent headaches. AR 175-80. Furthermore, Plaintiff stated that Imitrex, a medication prescribed for migraines, was ineffective in treating her symptoms. AR 181. Lastly, Plaintiff complained of a reduced attention span and ease of distraction. AR 177, 179.

#### 2. Katherine Kiesel, LCSW[14]

Plaintiff met with Katherine Kiesel, LCSW, at Upper Manhattan Mental Health Center, from October 30, 2009, until July 7, 2011. AR 324, 454-79. Over the course of her evaluations, Plaintiff only once complained of side effects of her medication, with that side effect being weight issues. AR 454-79. In her report dated December 15, 2010, Ms. Kiesel stated that Plaintiff was mildly depressed and concerned about her relationship, her sister's health, and finding a school for her son. AR 454. Plaintiff stated to Ms. Kiesel that she finished her degree

---

[14] Ms. Kiesel saw Plaintiff for weekly therapy sessions at Upper Manhattan Mental health Center, but she is treated as a non-medical source under 20 C.F.R. §§ 404.1513(d), 416.913(d).

online and was "seriously considering grad school for radiology therapist." AR 454.[15] Plaintiff continued to take her prescribed medication. AR 458.

In Ms. Kiesel's report dated February 7, 2011, she indicated that Plaintiff was continuing to tolerate her living arrangements with her domestic partner. AR 459. Plaintiff indicated that she was unsatisfied with her relationship, and that her domestic partner was addicted to marijuana, but expressed a need to remain in the relationship for financial reasons. AR 459. Additionally, Plaintiff reported no side effects from her medication but was perceived to be "somewhat depressed." AR 459. On March 28, 2011, Plaintiff expressed an interest in being taken off Paxil. AR 464. On April 29, 2011, Plaintiff again reported that she maintained her relationship for financial reasons, and continued to express an interest in being taken off Paxil for weight loss reasons. AR 468. Ms. Kiesel also referred Plaintiff to the Vocational and Educational Services for Individuals with Disabilities Program ("VESID") for a potential remedy to her domestic situation. AR 468.[16]

In her report dated May 10, 2011, Ms. Kiesel noted that Plaintiff claimed to be feeling "much better" and was exercising, socializing with other mothers in the neighborhood, and considering going to Touro College. AR 471. Plaintiff stated that her relationship with her domestic partner was better and expressed a continued need for him financially. AR 471. On May 23, 2011, Ms. Kiesel indicated that Plaintiff was feeling "much better" as a result of exercising and dieting. AR 472. Additionally, Plaintiff reported a better relationship with her

---

[15] Plaintiff explained that she was financially dependent on her domestic partner and stated that her desire to further her education conflicted with her need to find a job to support her son. AR 548.

[16] VESID is now the Adult Career and Continuing Education Services-Vocational Rehabilitation Program. Vocational and Educational Services for Individuals with Disabilities Program, NYC.gov, http://www1.nyc.gov/nyc-resources/service/2696/vocational-and-educational-services-for-individuals-with-disabilities-program (last visited Feb. 2, 2017).

partner and that she had been making friends in her exercise class. AR 472. On June 27, 2011, in response to Plaintiff stating that she was planning to apply for disability benefits, Ms. Kiesel informed Plaintiff that patients with worse mental illness are often denied disability benefits, and encouraged Plaintiff to seek work instead. AR 477.

### 3. Plaintiff's Hearing Testimony

At the May 4, 2012, hearing, Plaintiff testified that she had trouble leaving her home and suffered from panic attacks, anxiety, and migraines. AR 79, 86. Plaintiff stated that she had been accompanied to the hearing by a friend. AR 83. At the time of the hearing, Plaintiff was seeing a therapist weekly and her psychiatrist, Dr. Singh, monthly. AR 84-85. Additionally, Plaintiff had been prescribed 30 mg of Prozac and 0.5 mg of Klonopin to be taken daily. AR 85. Plaintiff indicated that the side effects of the medication included being groggy, not so clear, and tired. AR 85. Plaintiff suffered from migraines as often as two to three times per week, with each migraine lasting between one and two days. AR 86.

Plaintiff testified that she was unemployed. AR 78. She received a bachelor's degree from the University of Phoenix, online, which she completed in 2010, after approximately five years. AR 77. She testified that she would like to go back to school for nursing or radiology but indicated that her panic attacks and anxiety prevent her from doing so. AR 79. She further testified that walking in public and commuting to doctors' appointments generally caused her panic. AR 79. With respect to the frequency of the panic attacks, Plaintiff testified that she had approximately three to four per week since the birth of her son, six years prior. AR 80.

Plaintiff testified to having pursued several social activities. AR 80-82. She attended a Zumba exercise class in the summer of 2011, which was held in her neighborhood, but it did not alleviate her stress. AR 80-81. Additionally, she volunteered at her son's preschool, which was

11

located near her residence. AR 81-82. She had not volunteered at her son's new kindergarten, because of the distance from her home. AR 82. Plaintiff testified that she has had an inconsistent relationship with her domestic partner, starting at the time of her pregnancy, and at the time of the ALJ hearing, she had not been with him in approximately six months. AR 82-83. Plaintiff testified that she was the primary caregiver for her son. AR 84.

### 4. The Vocational Expert's Hearing Testimony

Melissa Fass-Karlin, a vocational expert, testified at the hearing on May 4, 2012, before the ALJ. AR 89-93. Ms. Fass-Karlin reported that Plaintiff had previously held positions as a receptionist and eligibility worker, but she was no longer fit to hold these positions. AR 90-91. The ALJ proposed two hypothetical claimants with varying limitations to be assessed by Ms. Fass-Karlin. AR 91-92.

The first hypothetical claimant had no exertional limitations. He or she could remember, understand, and carry out simple instructions; make simple decisions, maintain attention and concentration for up to two-hour segments for rote work; maintain a regular schedule with occasional close interpersonal contact with others; and work in a low-stress job which does not require a fast-paced production or high-volume production and no sub-supervisory duties. AR 91. However, this hypothetical claimant was incapable of working with hazardous machinery or from unprotected heights, due to the side effects of her medication. AR 91.

Ms. Fass-Karlin testified that an individual of Plaintiff's age, education and work experience, along with the limitations outlined by the ALJ, could perform several unskilled jobs in the local and national economy. AR 91-92. Ms. Fass-Karlin identified jobs such as cleaner, kitchen helper, and meat clerk. AR 92. Consistent with the Department of Labor's <u>Dictionary of Occupational Titles</u>, the vocational expert determined that there were 53,197 jobs in the local

economy and 1,067,857 jobs in the national economy, for the position of cleaner; 4,292 jobs

locally and 279,633 jobs nationally for the position of kitchen helper; and 2,863 jobs locally and

85,999 jobs nationally, for the position of meat clerk.[17] AR 92.

The second hypothetical claimant could not maintain a regular schedule; work in

coordination with or in proximity to others without being distracted by them; complete a normal

workweek without interruptions from psychologically based symptoms; travel to unfamiliar

places or use public transportation; perform low stress jobs; and would be expected to lose more

than three work days per month. AR 91-92. Ms. Fass-Karlin concluded that the second

hypothetical claimant would have no available work in the local or national economy. AR 92.

## II. **APPLICABLE LEGAL PRINCIPLES**

### A. **Standard of Review**

The scope of review in an appeal from a social security disability determination involves

two levels of inquiry. First, the court must review the Commissioner's decision to determine

whether the Commissioner applied the correct legal standard when determining that the plaintiff

was not disabled. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the

correct legal standard is grounds for reversal of the ruling. Townley v. Heckler, 748 F.2d 109,

112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision was

supported by substantial evidence. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir.

2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." Id. at 106 (internal quotation marks and citations omitted).

When determining whether substantial evidence supports the Commissioner's decision, it is

important that the court "carefully consider[] the whole record, examining evidence from both

---

[17] See U.S. Department of Labor's Dictionary of Occupational Titles, Job Codes 22-684,010, 381.687-018, and 318.687-101.

sides." Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted). If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

### B.     Determining Disability

In the context of disability benefits, the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i),(b). If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant was not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i),(b). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to the second step. Second, the Commissioner considers the medical severity of the claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant's impairment is severe if it consists of "any

impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. See 20 C.F.R. §§ 404.1520(a)(4)(iii),(d), 416.920(a)(4)(iii),(d). If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity ("RFC"). See 20 C.F.R. §§ 404.1520(e), 416.920(e). Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f), 416.920(a)(4)(iv),(e)-(f). If it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's RFC, age, education, and work experience to see if he or she can make an adjustment to other work. See 20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v),(g). In order to support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, in light of his or her RFC and vocational factors, is capable of performing. See 20 C.F.R. §§ 404.1560(c), 416.920(c).

The claimant bears the burden of proof on the first four steps of this analysis. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citations omitted). If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work. DeChirico, 134 F.3d at 1180 (citation omitted).

## III. DISCUSSION

Plaintiff argues that the ALJ's findings are not supported by substantial evidence and are contrary to law. ECF No. 1, at 3. Specifically, Plaintiff contends in her motion that the ALJ failed to follow the treating physician rule and improperly evaluated Plaintiff's credibility. Lastly, Plaintiff argues that the Appeals Council failed to consider new and material evidence submitted after the ALJ's decision. ECF No. 12, at 9, 15, 17. Plaintiff therefore asks this Court to reverse the decision of the Commissioner denying the award of benefits, or remand the claim for a new hearing and decision. ECF No. 12, at 21. For the reasons discussed below, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's motion should be denied and the Commissioner's motion should be granted.

### A. The ALJ's Decision

In deciding Plaintiff's case, the ALJ applied the five-step sequential analysis set forth above. As an initial matter, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. AR 62. At the first step of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 1, 2007, the alleged onset date, through May 29, 2012, the date of the ALJ's decision. AR 62. At the second step, the ALJ determined that Plaintiff suffered from depressive disorder, panic disorder, generalized anxiety disorder, and a history of migraine headaches. AR 62. The ALJ found that these impairments were "severe" under 20 C.F.R. § 404.1520(c) and § 416.920(c) because they imposed more than minimal limitations on Plaintiff's ability to perform basic work activity. AR 62. The ALJ found that Plaintiff's obesity was not severe, as it had not caused limitations that affected Plaintiff's ability to perform routine movement and necessary physical activity within the work environment. AR 63.

Third, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the severity of listings 12.04 or 12.06 in Appendix 1 to Subpart P in Part 404 of the Social Security regulations. AR 63. In order to meet the requirements under these listings, Plaintiff's mental impairment must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. AR 63. Repeated episodes with extended duration requires three episodes within one year, or an average of once every four months, each lasting for at least two weeks. AR 63. The ALJ determined that the minimum of two impairments had not been met. AR 63. Therefore, the ALJ proceeded to determine Plaintiff's RFC, finding that she had the ability to perform a full range of work at all exertional levels but with various non-exertional limitations. AR 64. Those limitations included avoiding work at unprotected heights or with hazardous machinery due to possible drowsiness from medications and avoiding "high-volume, fast-paced production or supervisory duties." AR 64.

At the fourth step of the analysis, the ALJ found that Plaintiff was unable to perform past relevant work, whether as a receptionist or an eligibility worker. AR 67. At the fifth step, the ALJ consulted the medical vocational guidelines (the "Grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, taking into account Plaintiff's age, education, work experience, and RFC. AR 68. Ultimately, the ALJ determined that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. AR 68. Accordingly, Plaintiff was not under a disability within the meaning of the Act at any time from August 1, 2007, the alleged onset date, through May 29, 2012, the date of the decision. AR 69.

## B.    The Treating Physician Rule

The ALJ correctly applied the treating physician rule when assigning limited weight to Dr. Singh's medical opinion. With respect to the weighing of opinion evidence, the ALJ is directed to consider every medical or psychiatric opinion in the record, regardless of its source. 20 C.F.R. §§ 404.1527(c), 416.927(c). Yet not every opinion is assigned the same weight. Under the regulations, the opinions of a treating source as to the nature and severity of a claimant's impairments are generally, but not always, entitled to "more weight" relative to those from other treatment providers. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Diaz v. Shalala, 59 F.3d 307, 313 n.7 (2d Cir. 1995). Such opinions are given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Rugless v. Comm'r of Soc. Sec., 548 F. App'x. 698, 700 (2d Cir. 2013). Conversely, these opinions "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino, 312 F.3d at 588. The Commissioner must "always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant's] treating source's medical opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating [source] is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

In this case, the ALJ assigned "limited weight" to Dr. Singh's opinions. AR 67. Where, as here, a treating psychiatrist's opinions are not given controlling weight, the ALJ considers a number of factors to determine the appropriate amount of weight to assign. 20 C.F.R. §§

18

404.1527(c)(1)-(6), 416.927(c)(1)-(6).[18] Rote recitation of every factor is not required, as long as the ALJ's "reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x. 67, 70 (2d Cir. 2013) (summary order). At core, an ALJ must "comprehensively" explain the reasons for the weight he or she ultimately assigns to a treating physician. Burgess v. Astrue, 537 F. 3d 117, 129 (2d Cir. 2008) (internal citations and quotations omitted).

Here, the ALJ assigned Dr. Singh's opinions limited weight because they were inconsistent with other substantial evidence in the record. Nevertheless, Plaintiff asserts that the ALJ failed to identify "good reasons" for rejecting the opinion of Dr. Singh. ECF No. 12 at 13. Moreover, Plaintiff argues that even if the evidence is not given controlling weight, the treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).[19] ECF No. 12, at 13. Plaintiff asserts that the ALJ failed to consider that Dr. Singh (1) treated Plaintiff for the time period in question; (2) treated Plaintiff for symptoms alleged to have caused the disability; (3) had an opinion consistent with the record; (4) was a specialist in psychiatry; and (5) provided specific support for his conclusions. ECF No. 12, at 15. It is clear from the ALJ's decision and the evidence in the record, however, that the ALJ weighed the medical opinion of Dr. Singh using the above stated factors.

First, the ALJ acknowledged that Dr. Singh treated Plaintiff from July 2008 through, at least, March 28, 2012. AR 66. The ALJ further stated that the purpose of the treatment was for generalized anxiety disorder. AR 66. Next, the ALJ cited medical examinations by Dr.

---

[18] These factors include: (1) the length and nature of the treatment relationship; (2) the degree to which an opinion is supported by medical and/or laboratory findings; (3) the consistency of the opinion with the record as a whole; (4) whether the treating source specializes in an area relevant to the claimed impairments; and (5) any other relevant factors which may be brought to the Agency's attention. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).
[19] See supra note 18.

Fujiwaki, as well as Plaintiff's own statements, to contradict the opinion of Dr. Singh throughout his decision. AR 64-67. The ALJ further acknowledged that Dr. Singh's own notes were inconsistent with his disability determination. AR 66. For instance, Dr. Singh's questionnaire stated that Plaintiff was markedly limited in her ability to perform various work-related activities, yet Dr. Singh assigned Plaintiff a GAF score of 60, which indicated only moderate symptoms. AR 558-65. Consistent with this GAF score, Dr. Singh consistently assessed Plaintiff's educational and vocational impairment as mild to moderate from October 24, 2008, through June 27, 2011. AR 283, 290, 297, 304, 311, 318, 325, 332, 339, 346, 353, 361, 368. Lastly, Dr. Singh noted that Plaintiff left her home without fear of anxiety (AR 565), and stated she was feeling good. AR 470.

As the ALJ correctly found, Dr. Singh's opinions were not consistent with the evidence in the record as a whole. Dr. Singh's determination that Plaintiff was markedly limited in her ability to work is contradicted by Dr. Fujiwaki's opinion, Plaintiff's own statements to LCSW Kiesel, and Dr. Singh's own treatment records. First, Plaintiff stated in a session with LCSW Kiesel that in the time leading up to her appointment on April 7, 2011, she went out without a fear of panic attacks. AR 65. Next, according to Dr. Singh's own records, Plaintiff did not suffer from a panic attack from April of 2011 through June of 2011. AR 66. Finally, in records from a psychiatric consultative examination on September 19, 2011, Plaintiff indicated that she had not had a panic attack since July of 2011. AR 67. Together, the record shows that Plaintiff suffered from panic attacks very rarely over a six-month period, contradicting her testimony that she had suffered from multiple attacks per week. AR 65-67, 80. The ALJ considered each of these statements when making his decision. AR 65-67.

Dr. Singh's opinion was further contradicted by the opinion of Dr. Fujiwaki. Dr. Fujiwaki determined that Plaintiff could follow and understand simple instructions; perform simple and complex tasks independently; maintain attention and concentration; maintain a regular schedule with assistance; learn new tasks; and make appropriate decisions. AR 495. Dr. Fujiwaki concluded that Plaintiff was only moderately limited in her daily life. AR 495.

Plaintiff contends, despite the foregoing, that the ALJ mistakenly relied on statements made by Plaintiff's social worker suggesting that she should seek work rather than social security benefits. ECF No. 12, at 13. In her brief, Plaintiff argues that LCSW "Klein's" statement that Plaintiff should seek work is contradictory because the questionnaire administered by LCSW Klein and Dr. Singh demonstrated Plaintiff's work preclusive symptoms. ECF No. 12, at 11. However, LCSW Kiesel was the individual who encouraged Plaintiff to seek work, not LCSW Klein, who in fact administered the questionnaire. AR 477, 565. Therefore, the statement was not contradictory; rather, it represented differing opinions between Ms. Kiesel, who had met with Plaintiff for therapy sessions for a period of approximately two years and believed that Plaintiff was able to work, and Ms. Klein, who had been newly assigned to Plaintiff when she determined that Plaintiff's symptoms were work-preclusive. AR 324-74, 449-79, 555-65. The ALJ reasonably construed the statement from LCSW Kiesel as a statement encouraging Plaintiff to work rather than apply for disability benefits. Moreover, LCSW Kiesel had previously recommended Plaintiff to seek employment assistance through VESID. AR 468.

The only factor that the ALJ did not explicitly discuss was Dr. Singh's qualification as a specialist in psychiatry, which is sufficiently clear from the evidence in the record. Moreover, as stated above, the ALJ is not required to recite every factor as long as the ALJ's "reasoning and adherence to the regulation are clear." Atwater, 512 F. App'x. at 70. The ALJ chose to limit the

weight of Dr. Singh's opinions in light of the contradictions within the record, and supplied valid reasoning for choosing not to assign controlling weight to Dr. Singh. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ, therefore, did not err in deciding to assign Dr. Singh's medical opinions limited weight.

### C.     The ALJ's RFC Determination

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with several non-exertional limitations.[20] AR 64. An RFC is the extent of what one is still able to do despite the limitations caused by his or her impairment(s). 20 C.F.R. §§ 404.1545(a), 416.945(a). Here, the ALJ's RFC determination is supported by substantial evidence in the record. The first limitation in Plaintiff's RFC is an inability to work from unprotected heights or with hazardous machinery. AR 64. The ALJ included this limitation due to Plaintiff's testimony regarding feelings of grogginess and drowsiness as a side effect of her medication. AR 85. Next, the RFC stated that Plaintiff could remember, understand, and carry out simple instructions. AR 64. This finding is supported by a Psychiatric/Psychological Impairment questionnaire (AR 497), as well as a separate and independent questionnaire completed by Dr. Singh. AR 561. Both sources stated that Plaintiff had the ability to remember and carry out simple instructions. Moreover, Dr. Fujiwaki noted that Plaintiff could "follow and understand simple directions and instructions." AR 495.

Substantial evidence supports the ALJ's finding that Plaintiff could make simple decisions and maintain attention and concentration for rote work in two-hour segments. AR 64.

---

[20] The non-exertional limitations included avoiding working at unprotected heights and with hazardous machinery, high-volume or fast-paced production, and supervisory duties. AR 64. Despite these limitations, Plaintiff had the ability to remember, understand and carry out simple instructions; make simple decisions; maintain attention and concentration for rote work in two-hour segments; and maintain a regular schedule with occasional close interpersonal contact with others in a low stress environment. AR 64.

Again, this finding is directly supported by the opinions of Dr. Harding and Dr. Singh, which stated that Plaintiff had no limitations in her ability to maintain attention and concentration for extended periods, nor was she limited in her ability to make simple work-related decisions. AR 497-98, 561-62. This finding is further supported by Dr. Fujiwaki's opinion, which stated that Plaintiff could maintain attention and concentration and make appropriate decisions. AR 495.

The ALJ's determination that Plaintiff could maintain a regular schedule with occasional close interpersonal contact with others in a low stress environment is also supported by substantial evidence. AR 64. In particular, Dr. Fujiwaki stated that Plaintiff could maintain a regular schedule. AR 495. Moreover, Dr. Harding opined that Plaintiff could perform activities within a schedule and get along with coworkers. AR 497-98. Lastly, the RFC stated that Plaintiff could not perform high volume, fast-paced production or supervisory duties. AR 64. Evidence supporting this element is found in Dr. Fujiwaki's opinion, which stated that Plaintiff may have a difficult time dealing with stress. AR 495.

As shown above, the ALJ's decision is supported by substantial evidence. Notwithstanding Plaintiff's arguments to the contrary, the RFC assessment was a result of the ALJ exercising his authority to choose between properly submitted medical opinions. As such, and in accordance with this Court's limited role of review, it must be upheld. See Alston v. Sullivan, 904 F. 2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); see also Marquez v. Colvin, No. 12-Civ-6819 (PKC), 2013 WL 5568718, at *14 (S.D.N.Y. Oct. 9, 2013) ("Where... the ALJ conforms with applicable law and SSA regulations, and the ALJ's decision is supported by substantial evidence, this court will not second-guess his [or her] judgment even in cases where there is substantial evidence to the contrary").

**D.     The ALJ's Evaluation of Plaintiff's Credibility**

The ALJ properly evaluated Plaintiff's credibility. In determining whether a claimant is disabled, the ALJ necessarily takes "the claimant's reports of pain and other limitations into account," and, to aid in this analysis, the regulations set forth a two-step process that is used to assess the claimant's credibility. Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ determines whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [his or her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); Genier, 606 F.3d at 49. If that is the case, then the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). The ALJ, however, "is not required to accept the claimant's subjective complaints without question; he [or she] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier, 606 F.3d at 49.

When evaluating a claimant's credibility, SSR 96-7P provides relevant criteria for an ALJ to consider. The ALJ must consider all available evidence, including objective medical evidence and other information regarding (i) the claimant's daily activities; (ii) the location, frequency, duration, and intensity of his or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medications taken; (v) treatment other than medication which used to relieve the claimant's symptoms; (vi) any measures used to relieve his or her symptoms; and (vii) other factors concerning functional limitations and restriction resulting from the claimed symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also SSR 96-7P, 1996 WL 374186, at *3 (S.S.A. 1996). The ALJ, however, is not required to "discuss all the factors [ ] as long as the decision includes precise reasoning, is supported by

evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning for that weight." Simmons v. Comm'r of Soc. Sec., 103 F. Supp. 3d 547, 569 (S.D.NY. 2015) (internal quotation marks and citations omitted). If the ALJ's analysis is commensurate with the foregoing, a reviewing court must uphold "the ALJ's decision to discount a claimant's subjective complaints of pain." See Aponte v. Sec., Dep't of Health and Human Servs., 728 F. 2d 588, 591 (2d Cir. 19984) (citation omitted).

Here, Plaintiff argues that the ALJ failed to consider the seven factors under SSR 96-7P or "offer some other good reasons for finding Plaintiff's allegations not credible." ECF 12 at 19. Yet, while the ALJ did not explicitly consider every factor listed in the regulations, he addressed those which were relevant to Plaintiff's claim, and detailed specific reasons for his credibility determination. Under such circumstances, "failure to discuss those factors not relevant to his credibility determination does not require remand." Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order). Regarding Plaintiff's activities of daily living, the ALJ considered Plaintiff's statements during a September 19, 2011, medical exam where she indicated that she cooked, cleaned, did her laundry, showered, bathed and dressed herself without any limitations, and fed and bathed her son. AR 63. The ALJ also addressed Plaintiff's online college courses, her ongoing relationship conflicts with her domestic partner, her sister moving in with her, socializing with other mothers at her son's school, volunteering at her son's school, and attending an exercise class. AR 64-66.

The ALJ addressed the frequency, duration, and intensity of Plaintiff's symptoms. While Plaintiff alleged that her panic attacks occurred three or four times per week (AR 79-80), the ALJ stated that the medical evidence did not support such a finding. AR 66. On April 7, 2011, Plaintiff stated that she left the house without fear of anxiety attacks. AR 65. Citing records

from Plaintiff's psychiatrist, Dr. Singh, the ALJ stated that "the claimant did not have any panic attacks or problems going out in public from at least April through June of 2011." AR 66. Furthermore, during a psychiatric consultative examination on September 19, 2011, Dr. Fujiwaki indicated that Plaintiff had not suffered a panic attack in the two prior months. AR 66. The ALJ also considered the side effects of Plaintiff's medications. Because Plaintiff's medications made her drowsy, the RFC included a limitation from working at unprotected heights or with certain hazardous machinery. AR 64. Additionally, however unsuccessful Plaintiff's efforts may have been, the ALJ addressed Plaintiff's attempts to overcome her symptoms by volunteering at her son's school, socializing with other mothers, and attending a Zumba exercise class. AR 65-66.

In determining disability, evidence to be considered includes the claimant's statements to others about his or her impairments, restrictions, daily activities, efforts to work, or any other statements made to medical sources. 20 C.F.R. §§ 404.1512(b)(1)(iii), 416.920(b)(1)(iii). The ALJ found it significant that, throughout Plaintiff's meetings with LCSW Kiesel, Plaintiff frequently expressed her financial dependency on her domestic partner. AR 65. Plaintiff expressed dissatisfaction with her relationship, but stated that she could not support herself and her son without financial assistance from her partner. AR 65. Furthermore, during the hearing with the ALJ, Plaintiff testified that she and her domestic partner were no longer together at the time of the hearing and had not been together since approximately November of 2011. AR 82-83. Moreover, Plaintiff showed a desire for further education, but could not afford to support herself and her son while pursuing a higher degree. AR 65.

The ALJ further relied on Plaintiff's statements made during therapy sessions with LSCWs Klein and Kiesel in determining Plaintiff's credibility. AR 65-66. During a therapy session on June 27, 2011, Plaintiff told LCSW Kiesel that she wanted to be a "stay-at-home"

mom, was financially dependent on her domestic partner, not ready to work, and was planning

on applying for social security benefits. AR 477. In response, LCSW Kiesel advised Plaintiff

that patients with more severe mental illnesses often get denied benefits and "encouraged"

Plaintiff to consider working instead. AR 477. As evidenced by the extent of the ALJ's

comments on Plaintiff's domestic and financial situations, the ALJ's primary concern was that

Plaintiff was seeking SSI as a source of income to fund her education and childcare, and not

because of her inability to work. AR 65-66.

Plaintiff cites Wright v. Astrue, No. 06-CV-6014, 2008 WL 620733 *3 (E.D.N.Y. Mar. 5,

2008), for the proposition that the ALJ must consider the seven factors under SSR 96-7, and that

it is reversible error to consider only one of the seven factors. ECF No. 12, at 19. Although the

ALJ must address the seven factors under SSR 96-7P, "the ALJ need not state explicitly the

reasoning for each step of the analysis." Simmons v. Comm'r of Soc. Sec., 103 F. Supp. 3d 547,

569 (S.D.N.Y. 2015). Where an ALJ's specific reasoning is lacking, a court may still uphold the

ALJ's conclusions "so long as [the court is] 'able to look to other portions of the ALJ's decision

and to clearly credible evidence in finding that his [or her] determination was supported by

substantial evidence.' " Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010)

(quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)). The ALJ addressed each

relevant factor of the SSR 96-7P analysis. As such, this issue presents no error in the ALJ's

credibility determination, which is otherwise supported by substantial evidence.

## E. Failure to Consider New and Material Evidence

A court can order the Commissioner to consider new evidence if certain conditions are

met. See 42 U.S.C. § 405(g), sentence six ("The court may ... at any time order additional

evidence to be taken before the Commissioner of Social Security, but only upon a showing that

there is new evidence which is material and that there is good cause for the failure to incorporate

such evidence into the record in a prior proceeding ..."). A claimant for disability insurance

benefits must show that the new evidence is truly "new and not merely cumulative of what is

already in the record." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir.1988) (internal quotation

marks and citation omitted). A claimant must also show that the evidence is material, *i.e.,* "both

relevant to the claimant's condition during the time period for which benefits were denied and

probative" and that the evidence gives rise to a reasonable possibility that it would have caused

the case to be decided differently. Id. Finally, new evidence submitted to the Appeals Council

does not require a showing of good cause to be admitted, as it does in submissions in federal

court. See Perez, 77 F.3d at 45.[21]

Upon submission of new evidence, the Appeals Council must "evaluate the entire record,

including the new and material evidence," in order to decide whether to review or deny the

appeal request. Id. Following the decision of the Appeals Council to review the case, the

evidence submitted will become part of the record, whether they have approved or denied the

appeal. Perez, 77 F. 3d at 45. Where, as here, the Appeals Council denies review of the

claimant's case, the reviewing court "simply review[s] the entire administrative record, which

includes the new evidence, and determine[s], as in every case, whether there is substantial

evidence to support the decision of the [Commissioner]." Id. at 46.

Plaintiff submitted to the Appeals Council medical records from Dr. Naarendorp dated

September 21, 2012, through November 30, 2012, as well as a narrative report and

---

[21] Revisions to 20 C.F.R. § 404.970(b), effective January 17, 2017, require a showing of good cause for the failure to present the new evidence to the ALJ prior to his or her decision. Compliance with the revised regulation is not required until May 1, 2017. Here, an analysis of good cause is not required because the new evidence was properly excluded as immaterial and substantially contradicted by evidence within the record.

Psychiatric/Psychological Impairment questionnaire by Dr. Eshkenazi dated August 29, 2012.

AR 7. The Appeals Council denied Plaintiff's appeal on June 18, 2013, stating that the evidence related to a time later than the ALJ decision, and therefore would not affect the decision. AR 6-7. Plaintiff contends that the evidence sheds light on the severity of her condition, and the case should be remanded for a determination in light of this new evidence.

The evidence submitted following the ALJ's decision does not require remand. First, Dr. Naarendorp's records are not material to Plaintiff's case. Dr. Naarendorp treated Plaintiff from September 21, 2012, through November 30, 2012, for dry mouth, joint pain, and fatigue. AR 23-32. Dr. Naarendorp did not treat Plaintiff for any of the symptoms that she claims caused her disability. The only information potentially relevant was a list of Plaintiff's current prescriptions, which included Prozac and Clonazepam. AR 30. While medical evidence cannot be considered irrelevant based solely on the timing of the medical examination, the evidence must still be probative of the Plaintiff's claims and give rise to a reasonable possibility that it would have caused the case to be decided differently. See Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (documents generated after the ALJ's decision were relevant to the time period of the alleged disability because they were pertinent to the severity of the disability and outlined additional impairments that were not considered by the ALJ). A minor change in Plaintiff's prescriptions after the ALJ's decision does not give rise to a reasonable possibility that the case would have been decided differently, nor is it probative of Plaintiff's condition during the time period of the alleged disability. The Appeals Council, therefore, appropriately rejected the medical evidence from Dr. Naarendorp and advised Plaintiff to file a new application. See Baladi v. Barnhart, 33 F. App'x 562, 564 n.1 (2d Cir. 2002) (when new evidence is submitted that "relates to the applicant's condition _after_ the date of the ALJ's decision, the Appeals Council

is required to return the evidence" and advise the claimant that he or she may file a new application) (emphasis in original).

Plaintiff also argues that since the opinion of Dr. Eshkenazi indicated greater psychiatric limitations than found by the ALJ, the case should be remanded to reevaluate the entire record. ECF No. 12 at 18. A decision may be remanded when new evidence "sheds considerable new light on the seriousness of [a claimant's] condition." Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985) (matter remanded after medical evidence revealed new diagnosis that influenced Plaintiff's ability to work). Since Dr. Eshkenazi's opinion was not considered by the ALJ at the time that he determined that Plaintiff did not meet the requirements for SSI or SSD, it is considered new evidence. Additionally, since Dr. Eshkenazi reviewed Plaintiff's medical history and noted that she has been disabled since 2007, it was relevant to the time period in question. AR 47. Dr. Eshkenazi's opinion was not, however, consistent with the medical evidence already contained in the record.

In his decision, the ALJ assigned limited weight to the Psychiatric/Psychological Impairment questionnaire produced by Dr. Singh because it was inconsistent with the objective medical evidence. AR 67. The questionnaire produced by Dr. Eshkenazi suggests an even greater extent of impairments than Dr. Singh's questionnaire, and demonstrates substantial inconsistency with the evidence in the record. Dr. Eshkenazi's opinion showed a higher degree of disability than the opinion of Dr. Singh in 9 of the 20 categories examined and a higher degree of disability in 14 of the 20 categories examined in Dr. Harding's opinion. AR 43-45, 561-63. Dr. Eshkenazi's opinion stated Plaintiff has far more disabling limitations than appear in the entirety of the record. Given the weight that the ALJ assigned to Dr. Singh's decision, coupled with the fact that Dr. Eshkenazi's opinion is contradicted by the majority of evidence in the

record, it is not reasonably likely that consideration of the evidence from Dr. Eshkenazi would have any effect on the decision by the ALJ. Furthermore, considering this evidence with the totality of the evidence in the record, there exists substantial evidence to support the decision of the Commissioner that Plaintiff was not disabled from August 1, 2007, through May 29, 2012, under 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's motion for judgment on the pleadings (ECF No. 11) should be denied and the Commissioner's motion for judgment on the pleadings (ECF No. 22) should be granted.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.


Dated: April 24, 2017
      White Plains, New York


           Respectfully submitted,

           Lisa Margaret Smith
           United States Magistrate Judge
           Southern District of New York